Wilkin, J.
The controversy is between two employes of a railroad company. The question is, Which one was negligent, the one who gave or the one who received a signal?
1. What was the signal? The signal is given by a motion of the arm up and down in a plane perpendicular to and in a line with the track; if it be a back-up signal, the motion will be directed away from the engineer and describe a circle; if it be a go-ahead signal, the motion will be toward the engineer, up and down, and the arm will describe only a quadrant or less of a circle, not a complete circle. The motion may be by the arm from the shoulder as the center or by the hand from the wrist as the center. The former is called the arm movement, the latter the wrist movement. It is manifest that the significance of the signal is determined by the direction of the motion, if not enough of it is seen to make óut a circle. " " '
It is conceded that the track was straight, the day was clear and that the conductor, Fouts, •standing on the top of the rear end of the last car, was between five and six hundred feet distant from the engineer, who was standing in his cab with his head out of the side window looking back (west) for a signal. It is not disputed that the deck line of the car next to the engine waS about four feet higher than the head of the' engineer, *308 and that only the. head of the conductor appeared above that line, to the vision of the engineer. In this- situation Barnes saw the head of a man in the sky; he could not tell who he was, for he says he could not discern the features; and that fact is not denied but is confirmed by Fouts, who says he. could not see Barnes at the cab, although Barnes was looking against the light and Fouts was looking from the light.
Fouts testified that he gave the circular sign by the arm. movement to back up. Barnes testified that he ■ saw only the wrist movement as a go-ahead signal. By the very nature of the case and the situation of the two men, their statements are not contradictory,- for all that Barnes could see of .the circle above the roof line of the car next to him, if Fouts gave the arm movement, would be but a small arc of the circle; Fouts5 hand would be seen; against the bright afternoon sky rising and falling in the plane of Barnes5 vision. Nobody has said and nobody can say that the direction of .the circular motion would be apparent to him in an arc so short; it could not be more than one-quarter of the circle.
Consequently his testimony is the only evidence as to the signal which he received, no matter what the form of the signal which was given. His statement of what he saw, not only has not been contradicted but is not impaired by the testimony or the circumstantial evidence in the case. Granted that the motion of the hand in the arc was a movement backward and not simply up and down, we are not concerned with that fact at the end of the train} but with another fact in the cab of the *309 engine, namely, the state of Barnes’ mind. - 'Nothing in the record nor in the state of nature raised the slightest inference that this latter fact was other than Barnes says it. was, to-wit, the' sight of the hand against the sky rising and falling above the base line of vision. That was the go-' ahead signal by the wrist movement.
This being the first essential fact in the case, and absolutely proven to be as the defendant asserts it to be, the verdict of the jury has not a jot' of evidence to support it on that branch of the issue.
2. Let us now examine the second branch of the issue. Conceding, that Fouts gave the signal as he says he gave it, was Barnes negligent for seeing the sign as he saw it? Did he omit to use the ordinary care of a prudent engineer in looking for the signal? There is not a spark of testimony that he did. Plaintiff’s theory is that the negligence of the observer is a prima facie inference from, the error of his observation; therefore, this inference supports the verdict and makes a prima facie case. But the answer to this is that there is not one syllable of evidence that the observer was negligent in the slightest particular, nor is there any evidence from which a legitimate inference can be drawn.
This question must be answered by common sense, from uniform experience. The primary', fact is that he could hot see all of the sign, if' Fouts gave it as he says he did; he saw but the upper part of it which was visible above the deck line of the car next to him, namely, a' hand up beside the .head, waving up and down, - Should: *310 he have seen the direction of its motion, whether it was circular and backward ?
He could not see the curve of motion in the vertical plane - of vision. A visual image and its changing position up .and down, was all that the eye saw and all that the brain knew by sight. The variation of- the color and contour of the image and especially the figure described by its motion were necessary to show that it was the backward sign. ■ These phases would be added in the.mind to the original image as attributes. Thus; the successive percepts of the changing position of. hand and arm backward in a circle, would merge- into one composite mental picture, or concept. This-concept is what we say we see, whereas it is a pure' product of the mind; it is a judgment of what. we see. Barnes saw just enough of. the ■ hand’s ' motion at the side of the head to complete the short sign; he judged it to be the go-ahead'signal—which it was. He did not see the-hand and'its backward motion below the horizon of . vision. . He did not include that invisible phase in the .mental picture of what he saw. He did.-not imagine■ he saw a figure three-fourths or more of which ■ was out of sight, since what he saw-was1 completé in itself and had a definite meaning.
How Barnes, the engineer, is accused of negligence, because he failed to understand a certain gesture of the arm given him by the conductor, Fouts, at a distance and in a place where only a small part of the gesture was visible to him. Had he seen-.the whole, gesture it would have meant a back-up signalp he saw but one-fourth of it or *311 less, a gesture of. the hand from the .wrist, up beside the head. ■ What appeared to him as. a wrist movement, he judged was not an arm move-, ment. It was a go-ahead signal, and he obeyed it. The jury found him guilty of negligence on this state of facts, because he did not imagine he saw what he did not see.
It is said he should have known the sign by the position of the hand and the curve which it described. This proposition begs the question. If the play of light and shade- upon the conductor’s head was. not' sufficient to discern at that distance whose head it was, then naturally it was' not sufficient to discern whether the palm or the back of the hand was presented—just as Barnes testifies. If the motion of the hand, through the short arc that was visible, was across the plane of vision, its direction would not be backward, and it would not mean a back-up signal. If it was in the line of vision, the direction of the circle, whether forward or backward, would not be apparent, so far away; the hand would be seen to rise and fall, which would be a go-ahead signal—just what he testified it appeared to be.
Stress is laid upon the admitted fact that Barnes was expecting a back-up signal. .This goes upon the principle of mental suggestion; which is, that when an ocular image, or a percept of any other sense, is presented to the mind, the very habit of the mind is to clothe the barren image with some attributes by which it will mean something. A common expression is that “wish is father to the thought;” the same may be said of expectation; 'But this by no means proves that if Fouts gave *312 the sign , of á bird in its flight, that Barnes should have seen in his mind's eye. a crawfish and have, gone backwards. Suppose the last car had stopped too near the switch, which often happens, and that Fouts had given a signal to go ahead so as to' bring the fear wheels past the switch points, and. Barnes, expecting a back-up signal, had misread the go-ahead as a back-up signal, and the unexpected backward movement of the car had thrown Fouts off and injured him, would the law of suggestionhave excused him in the courts below? Why not? Because they would have said that it was his’ duty to obey the signal which was given him and not the .law of suggestion. ■ Another answer to this argument of suggestion is, though an engineer expects a signal to back into a switch,' he knows by common experience that he may have stopped short, and the instant he gets a go-ahead signal he' knows what has happened and he pulls ahead. The suggestion of expectation' is immediately corrected. Barnes says he thought he had not cleared the switch points. Barnes is not a psychologist nor expert in the art of introspection. Because he could not explain the natural operation of his own mind as he would the mechanical operations of his engine, that is no reason in the world that the state of his mind, at the time he saw the conductor's head and hand above the cars, was not-just’ what he says ‘ it was. As we have- 'already said,: it is impossible for anybody, by any method of proof, mental or physical, to' impeach his statement of whát he saw. The verdict of the jury is not' only unsupported by any evidence 'but it is also directly contrary, to the evidence. '
*313 The plaintiffs counsel tried to break the conclusive effect of Barnes’ statement by drawing from him this rule of the service, to-wit: “In case of doubt or uncertainty, the safe course must be taken and no risks run.” This argument also begs the question. It implies that Barnes must have been in doubt about what he saw. But such is not the fact. Barnes testifies promptly and positively that he had no doubt at all. Counsel seems to have the notion that because Barnes saw only the conductor’s head and could not have seen the full signal, therefore if he had been duly cautious he would have been in doubt and should not have acted. Manifestly that deduction would be right if the only part of the signal which he saw was ambiguous, but the part he saw was exactly the go-ahead sign, and therefore was not ambiguous. So that this circumstance does not afford a scintilla of proof to support the verdict.
'3. Now we come to the third branch of the issue, namely, contributory negligence. By the plaintiff’s method of cross-examination of the engineer, he gave the deathblow to his case.' He attempted to make apparent that it was negligence for Barnes to receive a signal • given as and where that signal was given; that he should not have acted upon an imperfect signal. This argument clearly puts the ..fault of negligence upon the plaintiff, the conductor. For, if the signal could not be given perfectly or completely to the engineer from the top of the car at that distance back from the engine, he should’ not have got upon the car to give the signal, but should have given it from the ground, where all of it could’ have, been seen *314 distinctly. He was superior in rank to the engineer, and it was his duty to communicate his orders to his inferior so that they could not be misunderstood and bear a contrary meaning. If he gave half an order só that it appeared to be a whole order with nothing left off, that was his own blunder, due to his reckless choice of an imperfect method of communicating his commands.' It is therefore absolutely clear on the record of the whole case that whatever negligence may be imputed to these servants, it belongs to the superior in service, the conductor, who is in charge of the train; for his was the initial act which was the direct, proximate and efficient cause of his injury; the engineer was his innocent agent to carry out his will. He expressed his will one way though he intended the opposite.
As an excuse for giving the' signal from the top of the car, the plaintiff says he got up there so as to be the better able to direct the movements of the train when it would enter the curved siding. But this does not explain why he should give the signal from the top of the car, on a straight track, before it entered the siding. He admits the signal could have been given in a more favorable circumstance and to better advantage from the ground. The fact that he offered any excuse at all is a confession that the act was wrong.
He further says that he stood at the edge of the car and leaned out to make the signal, but he admits that he could not see the engineer, whose head stuck out of the cab window. The record shows the car next the engine about two feet wider than the cab. How then could the engineer *315 see him past the edge of the car? The proof shows that by a rule of the road it was his duty to place himself in full view of the engineer before attempting to give a signal. He says he leaned out from the edge of the car as far as he could. But there is no evidence that he, on the eleventh car back, without anything to hold to, could lean out far enough to make the vertical circle with his arm so it could be seen from the cab window. Possibly it might be done, but the verdict can stand only upon some proof of what was done, not upon conjecture of what might be done.
Now let us suppose that this conductor, Fouts, had brought his action against his engineer for damages to compensate him for the loss of his leg, which he could have done; for if Barnes’ negligence caused his injury, Barnes is primarily liable to pay for the wrong, and the employer is only responsible secondarily. Had he sought to enforce this primary liability first, would the jury have found Barnes guilty and condemned him to pay his conductor $7,500 for the loss of his leg? If. such a verdict would not be just and lawful against Barnes of course it can not be against his employer, the railroad company. •
Objection is made that the record does not present to us all the evidence in the case; that concrete evidence of the signal was given to the jury by ocular demonstration in the court room, and that this exhibition of the real thing is more reliable than word pictures of it. This objection is untenable and it points out the very source of the error of the lower courts. It was a mistake to let the plaintiff attempt to reproduce in view of *316 the jury in the court room the signal which he thought he gave. The controversy was not about: how he made the signal, but how it appeared to the engineer in his situation in the open country, as seen against a bright afternoon sky at five-hundred to six hundred feet distant when only the head and hand of the conductor were visible. What the jury saw close at hand within doors under a subdued light was a distinctly different thing than that which was presented to Barnes, against a bright sky, five to six hundred feet away.
This sort of evidence is called “autoptic” or “real” proof, to distinguish it from testimonial and circumstantial proof. In his Pocket Code of Evidence, page 31, Wigmore says: “In the latter classes the tribunal is asked to make an inference from the evidential fact to some other fact, while in the former the tribunal is asked to perceive immediately by the senses without inference.” Would anybody be bold enough to say that the jury could directly perceive in this mimicry in the court room, without the proper stage accessories, exactly how Fouts’ gestures on top the car looked to Barnes in the cab ? The exhibition was deceptive and misleading. The exclusion of it from our view of the case, instead of impeaching our judgment, affords the substantial reason of our judgment; by exposing the initial essential error of the courts below.

Judgments reversed, and judgment for plaintiff in error.

Shauck, C. J., Johnson and Donahue, -JJ.j concur. Newman, J., dissents.